

ENTERED

MAR – 5 2010

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____Deputy Clerk

FILED

MAR – 5 2010

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>FRUEHAUF TRAILER CORPORATION, et al.,<br><br>            Debtors. | Case No.: 96-1563 through 96-1572<br>Jointly Administered<br><br>Chapter 11 |
| DANIEL HARROW, as Successor Trustee of the End of the Road Trust and American Trailer Industries, Inc.,<br><br>            Plaintiff,<br><br>     v.<br><br>CHRISS STREET,<br><br>            Defendant. | Adv. No.: 08-01865RN<br><br>**MEMORANDUM OF DECISION AFTER TRIAL**<br><br>DATE:     February 3, 2010<br>TIME:     9:00 a.m.<br>PLACE:    Courtroom 1645 |

## INTRODUCTION

This adversary proceeding came before this Court pursuant to the Venue Transfer Order signed by Judge Peter J. Walsh of the United States Bankruptcy Court in the District of Delaware and entered on or about October 9, 2008. The Complaint has been amended twice. The second amended complaint avers virtually the same

factual allegations as the first amended complaint with certain refinements. The causes of action have been reduced to the following: six (6) counts of breach of fiduciary duties, one (1) count for breach of liquidating trust agreement, one (1) count for equitable forfeiture of compensation, and one (1) based on fraud. Defendant Chriss Street ("Defendant" or "Street") counterclaimed for indemnification[1].

In Courtroom 1645 of the above entitled Court, the Honorable Richard M. Neiter, United States Bankruptcy Judge presiding, conducted a two-day bench trial on February 3 and 4, 2010. Robert T. Kugler, Robert L. DeMay and Jacob B. Sellers appeared on behalf of the Plaintiff Daniel W. Harrow ("Plaintiff" or "Harrow") and Phillip Greer appeared on behalf of the Defendant. No other appearances were made.

The Stipulated Facts in the Amended Order Approving Joint Pretrial Conference Statement[2] ("Amended PTO" or "Stipulated Fact(s)") as supplemented by the Supplemental Amendment to the Pretrial Order Pursuant to the Court's Order ("PTO Supplement"), the 164 Stipulated Exhibits for Trial ("Stipulated Exhibit(s)") and impeachment evidence marked as Exhibits 164, 165, 166, 168 and 169 ("Impeachment Exhibit(s)") govern the facts of this case. All Stipulated Exhibits and the Impeachment Exhibits were admitted into evidence at trial. The additional evidence consisted of testimonies

---

[1] This issue, however, is limited by the Delaware Bankruptcy Court's decision on summary judgment in the adversary proceeding entitled Street v. End of the Road Trust rendered on or about September 17, 2008 by Judge Peter Walsh.

[2] The Amended PTO was entered on January 14, 2010.

1  by the Plaintiff, Tasha Dolan, Abel Wenning, Plaintiff's damages
2  expert, Tammy Lyons, and the Defendant.[3]  All witnesses were cross-
3  examined.

4      The Court has carefully considered the Stipulated Facts,
5  Plaintiff's pretrial brief, the parties' post-trial briefs, the
6  testimonies and all exhibits admitted into evidence.  After trial,
7  the Court took the matter under submission and now renders its
8  Memorandum of Decision containing its findings of fact and
9  conclusions of law as required under Fed. R. Bankr. P. 7052.

10

11                    **STATEMENT OF EVIDENTIARY FACTS**

12      This is a case where a fiduciary lost sight of his mandate to
13  liquidate trust assets for the benefit of the trust's beneficiaries
14  by engaging in unsuccessful business ventures, self-dealing, and
15  violations of the liquidating trust agreement.  This conduct caused
16  the trust to lose significant sums of money otherwise available for
17  its beneficiaries and to delay their payment through seven (7) years
18  of the trustee's tenure.

19      On October 7, 1996, Fruehauf Trailer Corporation, Maryland
20  Shipbuilding & Drydock Company, F.G.R. Inc., Jacksonville Shipyards,
21  Inc., Fruehauf International Limited, Fruehauf Corporation, The
22  Mercer Co., Deutsche-Fruehauf Holding Corporation, MJ Holdings,
23  Inc., and E.L. Devices, Inc. (collectively, the "Debtors," and on
24  behalf of their respective creditors and interest holders,
25  collectively, the "Trust Beneficiaries"), filed petitions for relief
26  under chapter 11 of the U.S. Bankruptcy Code.  (Stipulated Fact ¶

27
_____
28  [3] Defendant withdrew his introduction of the testimony and report of
his damages expert Dennis W. Sinclair on the second day of trial.

1.)   The Debtors' Amended Joint Plan of Reorganization ("Plan") was confirmed on September 17, 1998 pursuant to an Order and Judgment Confirming the Plan which was later amended by an order entered on October 20, 1998.  (Id. ¶ 2.)  The Plan contemplated the creation of a Delaware common law liquidating trust to liquidate the Debtors' assets for the benefit of the Trust Beneficiaries.  (Id. ¶ 4.)  On October 27, 1998, Street and the Debtors entered into a Liquidating Trust Agreement ("Trust Agreement") which created The End of the Road Trust ("Trust").  (Id. ¶ 5.)

Trust assets were placed in six special purpose entities: (i) JSI Property Corp.; (ii) Hogan's Creek Realty, Inc.; (iii) Picketsville Realty, Inc.; (iv) Mayport Realty Inc.; (v) JSI Lexington Realty Inc.; and (vi) FrudeMex, Inc. ("FrudeMex"). (Stipulated Fact ¶ 10.)  FrudeMex was a Delaware corporation formed for the sole purpose of holding the stock of Fruehauf de Mexico, S.A. de C.V. ("FdM"), a Mexican operating company, and the most valuable asset of the Trust.  (Id. ¶ 12.)  As trustee, Street became the sole director and President of FrudeMex.  (Id.)  At the time the Trust was created, the Trust had an aggregate value of $21 million. (Impeachment Exhibit 164.)   In addition, the Pension Transfer Corporation (the "PTC") was created and included in the Trust estate to facilitate the ongoing sponsorship and administration of the Fruehauf Trailer Corporation Employees' defined benefit pension plan ("Pension Plan").  (Stipulated Fact ¶ 11.)

Beginning December 31, 1998, FrudeMex underwent several corporate form and name changes until November 8, 1999, when FrudeMex (then, FDM, Inc.) ultimately changed its name to American Trailer Industries, Inc. ("ATII").  (Id. ¶ 13.)  During this time,

1  Street was the sole director of ATII from November 19, 1999 through

2  August 1, 2005.

3       Defendant acted as trustee for the Trust from October 27, 1998,

4  to August 1, 2005 when Plaintiff took over as successor trustee.

5  (Id. ¶ 7.)   Street's duties, responsibilities, limitations and

6  rights as trustee were as set forth in the Trust Agreement.   The

7  Plan provided Street with indemnification for "claims arising out of

8  the good faith performance of duties under the Bankruptcy Code or

9  this Plan." (Stipulated Fact ¶ 9.)

10     **A.  Limitations of the Trust**

11      The express purpose of the Trust was set forth in Paragraph 2.3

12  of the Trust Agreement as follows:

13          "This Liquidating Trust is organized for the sole
            purpose of conserving and liquidating the Trust
14          Estate for the benefit of the Beneficial
            Interestholders as herein set out, with no
15          objective to engage in the conduct of a trade or
            business (although companies whose stock is owned
16          by the Liquidating Trust may operate a business).
            Pursuant to this express purpose, the Trustee is
17          hereby authorized and directed to take all
            reasonable and necessary actions to conserve and
18          protect the Trust Estate and to sell, lease or
            otherwise dispose of the Trust Estate, and to
19          distribute the net proceeds of such disposition .
20          . . in as prompt, efficient and orderly fashion as
            possible . . . ."
21

22  (Stipulated  Ex.  15.)    Paragraph  5.4.4  further  restricted  the

23  trustee's powers under the Trust as follows:
            "[t]he Trustee . . . *shall not at any time enter
24          into or engage in any trade or business,
            including,* without limitation, *the purchase of
25          any asset or property* (other than such assets or
            property as are necessary to preserve, conserve,
26          and protect the Trust Estate and to carry out
            the purposes of Section Two, Section Seven, and
27          this Section Five) on behalf of the Trust Estate
            or the Beneficial Interest holders."
28

5

1  (Id.)(Emphasis added.)    There was no implied duty outside of that

2  which was expressly stated in the Trust Agreement.    (Id. ¶ 7.2.; see

3  also Stipulated Fact ¶ 8.)    Moreover, for certain trust activities

4  such as:

5              (a) borrowing money in excess of $500,000 or
             granting liens on any part of the Trust Estate
6              in excess of $500,000;
             (b) selling assets of the Trust Estate with a
7              value in excess of $500,000;
             (c) modifying the Plan;
8              (d) initiating and prosecuting litigation,
             including but not limited to claim objections
9              with expected fees and costs in excess of
             $250,000;
10             (e) disposing of or settling any claim of
             litigation with a potential value to the
11             Liquidating Trust in excess of $500,000; and
             (f) foregoing or deferring the annual
12             distribution to Class A Beneficial Interest
13             holders,

14  Defendant was required to seek the Trust Advisory Committee's

15  ("TAC") prior approval.    (Stipulated Exhibit 15 ¶ 5.4.1.)

16       **B.   Violations of the Trust Agreement**

17       Contrary to the express limitations of the Trust, Street caused

18  the Trust to acquire the assets of a bankrupt trailer manufacturer,

19  American Trailer Manufacturing, Inc. ("ATM") through the formation

20  of ATM Acquisition Corp., n/k/a American Trailer, Inc. between

21  October and November 1999.    (Stipulated Fact ¶ 30.)    While there is

22  evidence that the TAC granted Street conditional approval to

23  purchase ATM for an aggregate price of $1,446,000, the evidence

24  suggests the same person signed for both TAC members.    This cast

25  doubt on the efficacy of the TAC's approval of the transaction[4].

26

27  _____
[4] The TAC members at the time the Consent of Trust Advisory Committee

28  was signed were Thomas Kempner of M.H. Davidson & Co. and Kevin
Schweitzer of Paloma Partners.    The last name of the person who

(Stipulated Exhibit 46.)   Indeed, the TAC approval provision of the Trust Agreement does not contemplate purchasing assets but is narrowed to selling Trust assets; thus, creating further doubt on the efficacy of the TAC approval Defendant obtained for ATM's purchase.   (Stipulated Exhibit 15 ¶ 5.4.1.)   Notwithstanding, ATM was ultimately purchased for the sum of $2,074,000 which exceeded the "authorized" purchase price by $628,000.   (Stipulated Fact ¶ 33.)

ATM never became profitable for the Trust.   Testimony revealed ATM was purchased in order for FdM, the Trust's operating company, to have a presence in the United States market by using ATM's trademark.   Hence, the two companies engaged in business where ATII would cover ATM's payroll and accounts payable and FdM would sell to and purchase goods from ATM.   Neither the TAC nor the Delaware Bankruptcy Court authorized FdM or ATII to engage in such business transactions with ATM.   (Stipulated Fact ¶ 44.)   ATM eventually dissolved in 2003.   (Id. ¶ 40.)   There was no evidence that ATM's trademark was sold.   This unauthorized business relation resulted in a loss to FdM totaling $1,112,350.00.

Contrary to the express limitations of the Trust, Defendant also caused FdM and ATII to engage in unauthorized business dealings with an entity called Dorsey Trailer Corporation ("Dorsey"), a bankrupt trailer manufacturer in Alabama which Street caused the

---

signed the Consent was unclear from the signed document.   However, it was clear that only one person signed the Consent (someone whose name appears to be Michael "Berner") even though it states that one signature is from Sunrise Partners LLC by Down General Partners Corp. and the other by Paloma Securities LLC by Paloma Partners Management Company.

1 Pension Plan to purchase in 2001. (Stipulated Fact ¶¶ 45, 47-49.)
2 Dorsey was not an asset of the Trust. (Id. ¶ 46.) The Pension Plan
3 acquired Dorsey as a vehicle to enhance the sales and purchasing
4 power of ATII as Street was increasing the operations of the Trust's
5 assets rather than liquidating them.

6    Dorsey's acquisition was based, again, on Defendant's desire to
7 establish a business presence in the United States by having a
8 factory and a trademark to use in the United States.[5] The intent,
9 according to various testimonies, was to create a synergistic
10 relationship between Dorsey and FdM from which Dorsey would
11 eventually emerge a profitable public company with Street as its CEO
12 and a substantial shareholder.

13    Similar to its dealings with ATM, ATII transferred funds to
14 Dorsey to pay for Dorsey's expenses totaling $913,690.25 as Dorsey
15 had inadequate cash flow to pay for all of its operating costs.
16 (See Stipulated Fact ¶ 56.) Likewise, FdM sold finished goods to
17 Dorsey and purchased materials from Dorsey's suppliers (which FdM
18 paid by transferring funds through Dorsey). The Trust also advanced
19 additional funds to Dorsey totaling $29,242. (Id. ¶¶ 53-54.) ATII
20 also paid for certain travel expenses totaling $126,131 which Street
21 and various ATII employees incurred in providing management services
22 to Dorsey. (Stipulated Fact ¶ 59.) Neither the TAC nor the
23 Delaware Bankruptcy Court approved the foregoing transactions.

24    Dorsey never became profitable. In September 2004, Dorsey
25 again filed a chapter 11 petition in Alabama. (Stipulated Fact ¶

26

27 [5] Without a license from Wabash National Corporation, FdM was not
authorized to conduct business in the United States under the
28 Fruehauf trademark because of Fruehauf's licensing agreement with
Wabash.

50.)  FdM filed a claim in Dorsey's bankruptcy case in the sum of $2,681,363 and ATII filed a claim in the sum of $500,000.  No payments were made on account of these claims.  The Trust's total loss, in connection with its business dealing with Dorsey, amounted to $3,336,736.  (Stipulated Fact ¶ 44.)

Defendant admitted at trial he was "hands-on" with respect to the major activities of the Trust, the Trust entities, and all of the aforedescribed transactions.  Street was actively involved in the day to day operations of Dorsey, ATM, ATII and FdM.  Tasha Dolan[6] testified Street approved fund transfers among the different entities and engaged in regular meetings with his management team.

This Court finds Defendant's justification for engaging in business with these entities, to create a business presence in the United States for Fruehauf de Mexico, contradictory to the express purpose of the Trust to liquidate Trust assets for its beneficiaries.  The length of time Street managed the Trust (7 years) and caused these companies to engage in business in the United States is evidence of the Defendant's apparent intent not to liquidate the Trust assets but to create a new trailer conglomerate that conducted business from Mexico to the United States and vice versa.  Such vision did not result in profit but rather depleted Trust funds to which Trust Beneficiaries would have been entitled. The Trust did not contemplate such activity; rather, it expressly prohibited it.  (See Stipulated Exhibit 15 ¶¶ 2, 3 and 5.4.4.) Defendant could not imply from the Trust's express language that such activities were authorized.  (See id. ¶ 7.2.)

---

[6]  Tasha Dolan was the controller of the Trust, the CFO of Dorsey and eventually its President.

This Court rejects Defendant's position that he cannot be held liable for the acquisition of ATM and Dorsey because he did not have the authority or right to approve such transactions. In his testimony, Defendant acknowledged that he recommended to the TAC and the Pension Plan committee the purchase of ATM and Dorsey, which further proved his endorsement of such purchases and his ultimate goal of building the Trust's business rather than liquidating it. Furthermore, even if the acquisitions were approved, nothing in the record of this case suggests that the Trust Agreement or the Bankruptcy Court approved of the multiple transactions among the Trust, FdM, Dorsey and ATM which caused a significant depletion of Trust funds.

This Court further finds absurd Defendant's concern regarding losing FdM's Fruehauf license in Mexico as the reason behind his attempts to obtain a brand name in the United States to continue FdM's operations. It is inconceivable that, on the advice of counsel, Street decided not to pay the royalties required to use the Fruehauf name when that was the only way to preserve the trademark in Mexico (an asset of the Trust). Defendant admitted at trial that losing the license would be "catastrophic". Accordingly, stopping payment on the royalties was fundamentally an imprudent decision and not in the best interest of the Trust's beneficiaries. The only plausible explanation for the acquisition of ATM and Dorsey is that Defendant was attempting to create an operating company that would do business in the United States and Mexico that would go public and enable Street to earn substantial sums as its CEO and as a major shareholder. It was not to preserve the Trust assets while pursuing their liquidation. It violated the Trust Agreement.

This Court further rejects Defendant's contention that he undertook the foregoing actions to enhance the value of FdM. Contrary to Plaintiff's testimony that the Trust's assets were valued at $21 million at the Trust's inception (Impeachment Exhibit 164), Defendant later testified that FdM's value, the largest asset of the Trust, was $250,000 at the Trust's inception. The Court does not find Defendant's testimony credible given that throughout his tenure, (i) FdM was the only company in the Trust with sufficient cash flow to fund its operations in addition to the operations of Dorsey and ATM; (ii) FdM was listed as having a value of $9.5 million in the Trust's financial statements for 1999, 2000 and 2001 as prepared by Eisner LLP, the company's auditors during Street's tenure (Impeachment Exhibit 164); and (iii) the Successor Trustee valued FdM at $8 million at the time it was liquidated.

## C. Improper Accounting

Testimony at trial was also telling of the extent of improper accounting and Defendant's failure to keep adequate books and records during his term as trustee. Plaintiff testified when he took over as successor trustee, the Trust's books and records were in disarray and no document-retention policy was in place to ensure good record-keeping. Defendant did not refute Plaintiff's testimony. Instead, he stressed that Ms. Dolan was in-charge of accounting as the Trust's controller. However, while Ms. Dolan was responsible for managing the Trust's books and records, Defendant oversaw all management activities of the Trust including the information placed in the Trust's books. Defendant was provided regularly with financial reports of the Trust having full knowledge of any inadequacies in such statements.

Second, Abel Wenning's[7] testimony revealed Defendant instructed some members of his team that certain transactions were not to be highlighted or disclosed in FdM's regular books and records and its financial statements such as loan agreements and transfer pricing items that violated GAP rules in Mexico.   Mr. Wenning maintained a separate set of books for those agreements and transactions and even set up a separate entity with an office address at his residence. Street's preferred means of communication with his management team was oral and not written while only selective items found their way into a company's books.   This lack of proper documentation evidenced Street's improper record-keeping as the Trust's fiduciary.   The absence of proper books and records also prevented ATII's and FdM accountants from opining on the consolidated financial statements that would have enabled ATII to save over \$1.5 million in taxes. Later, this became a major obstacle to selling FdM.

**D.   Street's Compensation as Trustee and Self-Dealing**

This Court adopts the decision of Judge Peter J. Walsh, as contained in his Memorandum of Decision dated September 17, 2008, which found that the Disclosure Statement, Plan and Trust Agreement were the sole governing documents for Defendant's compensation. (Stipulated Exhibit 44.)   In it, Judge Walsh found invalid the provisions of the purported employment agreement with the Trust and the purported employment agreement with FrudeMex to the extent that they contradicted the Trust's express language, which stated:

> "[t]he Trustee shall not manage, control, use sell, dispose, collect or otherwise deal with the trust estate or otherwise take any action hereunder, except as expressly provided herein,

---

[7]   Mr. Wenning was in charge of FdM's operations during most of Street's tenure.

and no implied duties or obligations shall be read into this Agreement in favor of or against the Trustee. . . " and

"[t]he Trustee may not modify the terms of this Liquidating Trust Agreement unless the Liquidating Trustee secures the written approval of such modification from Class A Beneficial Interestholders holding over 50% of the Class A Beneficial Interest."

(Stipulated Exhibit 15 ¶¶ 7.2 and 5.4.3, respectively; Stipulated Exhibit 44.)    Accordingly, the provisions of the Disclosure Statement as amended and dated July 28, 1998, the Plan and Trust Agreement govern the terms of Street's compensation.

Street's compensation under the Trust Agreement was to be set by a missing "Exhibit C" to the Trust Agreement.    (Stipulated Fact ¶¶ 70-71.)    As disclosed in the Disclosure Statement, Street was entitled to receive an annual salary of $200,000 for serving as trustee and $50,000 for serving as Chairman and CEO of FdM. (Stipulated Exhibit 14 ¶ IV.L.1 and 2.)    He was also entitled to receive "all reasonable out-of-pocket expenses incurred in the performance of his duties."    (Id. ¶¶ IV.F.7.b. and IV.L.2.)    As the Chairman and CEO of FdM, he was provided with "all fringe benefits and perquisites that [were] provided to senior executives of FdM, . . . all employee benefit plans, programs and arrangements. . . ." (Id. ¶ IV.L.2.)    The record does not show any other basis for compensation other than the foregoing.

In violation of the terms of his compensation, Defendant paid himself the additional sum of $242,544 during his term from 1998-2005.    (Stipulated Exhibit 115.)    The record in this case did not prove his entitlement to any amount exceeding his authorized compensation stated above.    This Court finds it unnecessary to

1   distinguish the source of Defendant's compensation.  Suffice to say,
2   Defendant was paid in excess of his entitled salary regardless of
3   which Trust entity paid him.

4       Similarly, FdM reimbursed Defendant's personal expenses and
5   charitable contributions in violation of the authorized terms of his
6   compensation.   The record demonstrates that Defendant's company
7   credit card was used for both work and personal expenses.  Testimony
8   showed FdM paid the entire balance on Defendant's credit card
9   monthly upon his direction (i) with no expense reports submitted
10  despite a company policy to do so and (ii) without distinguishing
11  between personal and work-related expenses.  If there was a company
12  policy for expense reimbursements, Defendant seems to have placed
13  himself above such policy.

14      For example, FdM paid on Defendant's behalf significant amounts
15  for travel to South America.  No business purpose was shown for such
16  trips.   Defendant's position that traveling to South America might
17  have expanded FdM's business was contrary to the purpose of the
18  Trust to liquidate its assets.  He was hired to dispose of the
19  business, not grow it with all the attendant risks attributable to
20  an operating business.

21      Defendant's reliance on a purported list of 100 or so different
22  fringe benefits he obtained monthly from a local Mexican attorney to
23  justify such personal expenses lacks credibility.  First, evidence
24  of such a report and its authenticity was not presented at trial.
25  Second, even if such list of benefits existed, Defendant failed to
26  demonstrate that the personal charges made on his credit card FdM
27  reimbursed fell within those types of fringe benefits purportedly
28  available to a *Director de General* of a company in Mexico.  Because

of these reimbursements, the Trust lost $203,754. (Stipulated Exhibits 108 and 109.) It is a further violation of his duty for a fiduciary to permit a large sum of money to be paid to reimburse him for his own personal gain.

This Court is not convinced by Defendant's position that so long as nobody objected, his personal expenses were paid properly when he exercised control and decisions over all Trust assets. There is equally no evidence supporting Defendant's position in his post-trial brief that after deducting the offending "Mexican benefits", Street remained underpaid. (Defendant's Post-trial Brief at 14.) No calculation or other reliable evidence leading to this result was produced. Instead, the salary he received alone exceeded the total base compensation to which he was entitled under the Disclosure Statement as discussed above. (See Stipulated Exhibit 115.)

Likewise, testimony revealed that Defendant permitted his companies, Street Asset Management Co. and Chriss Street and Co., to use Trust assets, such as office space, telephone numbers, e-mails, and personnel, without reimbursing the Trust for their use. Defendant permitted Trust assets to be commingled with his personal assets without any method of separation or allocation. Defendant's testimony failed to prove otherwise.

Defendant's initial term as trustee was for three years which was automatically renewable for two one-year periods in the event that the trust estate had not been fully liquidated at the end of first three years. (Stipulated Exhibit 15 ¶ 9.1.) At the end of five years, Defendant could only extend his term further by seeking court-approval within 6 months of the fifth year. Id. Defendant

1  served for seven years from 1998 to 2005.   After six years of
2  Street's control without liquidating FdM, Defendant vigorously
3  opposed the beneficiaries, through the reconstituted TAC, efforts to
4  replace him.   This created a need for the TAC to seek intervention
5  by the bankruptcy court which resulted in another year of salary and
6  perks for Defendant.

### E.   Other Acts of Mismanagement

8      First, Defendant caused the Trust's fiduciary liability and
9  director and officer liability policies to be changed into "runoff"
10  status without justification for the risk which made it difficult
11  for the successor trustee to obtain standard (non-runoff) coverage
12  without paying a substantially higher premium.   (Stipulated Exhibits
13  135-137.)

14      Second, certain adversary proceedings pending at the onset of
15  the Trust went stale due to inactivity and lack of prosecution
16  during Defendant's tenure.[8]   Their dormant status made it difficult
17  for the successor trustee to revive and litigate the Trust's
18  remaining claims.   In one instance, the defendant had filed for
19  bankruptcy while the adversary proceeding was pending.   In another,
20  testimony revealed the Trust had to settle for less money because of
21  witness depreciation.   The delay in prosecution impeded meaningful
22  negotiations that may have led to a better return for the Trust.

23

24  [8] Upon his appointment, Street inherited the Debtors' preferential
transfer actions entitled (1) Fruehauf Trailer Corp. v. Aluminum Co.
25  of Am., Inc., Adv. Pro #98-00497, (2) Fruehauf Trailer Corp. v. Gen.
Bearing Corp., Adv. Pro. #98-00485, (3) Fruehauf Trailer Corp. v.
26  Milner-Rigsby Co., Ltd., Adv. Pro. #98-00488, (4) Fruehauf Trailer
Corp. v. ATEC Assocs., Inc., Adv. Pro. #98-00504, and (5) Fruehauf
27  Trailer Corp. v. Nat'l Union Fire Co., Adv. Pro. #98-00514
28  (collectively, the "Adversary Proceedings").

1  However, because the loss sustained as a result of Defendant's
2  overlooking such proceedings is speculative--the loss cannot be
3  quantified for purposes of Plaintiff's damages.

4      Third, Defendant also destroyed the Trust's files contained in
5  an Apple computer the Trust owned by reformatting the hard drive
6  causing all information therein to be erased.

7      Lastly, evidence afforded proof Defendant attempted to derail
8  the sale of FdM on two occasions. American Capital Services ("ACS")
9  initially expressed interest in purchasing FdM in 2004.  There were
10 contradicting testimonies from Plaintiff and Defendant on the
11 reasons why the sale did not close.[9]  What was undisputed was that
12 ACS encountered difficulty in dealing with Defendant and vice versa.
13 No evidence was presented showing Defendant attempted to fix the
14 stalemate.    Additionally, it was undisputed that Defendant
15 unreasonably withheld an essential environmental report.  In 2005,
16 ACS renewed its interest in purchasing FdM.  However, tax problems
17 emerged that caused the sale to fall apart.  Testimony showed that
18 Defendant failed to effectuate the timely filing of consolidated tax
19 returns on behalf of the requisite entities during the early stages
20 of the Trust as advised by Trust counsel Haynes and Boone, LLP.
21 (Stipulated Exhibit 131.)  Consequently, at the time of the second
22 sale to ACS, FdM's auditors were unable to prepare and certify the
23 requisite consolidated financial statements.   This resulted in
24 significant additional tax liability which caused ACS to lose

25

26 [9] Defendant testified the sale did not close because ACS offered a
   low price for FdM.  Plaintiff testified the sale did not close
27 because Defendant ignored due diligence requests, impeded due
   diligence efforts and delayed the release of an environmental
28 report.

1   interest in pursuing further the purchase of FdM. Eventually, the
2   Successor Trustee decided that FdM could not be sold and he
3   distributed its stock to the beneficiaries who held 80% of the
4   Debtor's bonded indebtedness.[10]  This was due to the difficulty in
5   selling FdM caused by the Defendant. At the hearing before Judge
6   Walsh, Defendant even attempted to purchase FdM claiming he had the
7   financing to accomplish the transition but Judge Walsh dismissed the
8   Defendant's offer and approved the disposition of FdM's stock to the
9   beneficiaries holding the largest claims against the Debtors.

### F.   Indemnification

11      The Trust Agreement permits indemnification of Defendant unless
12  he engaged in acts of gross negligence or willful misconduct.
13  (Stipulated Exhibit 15.)  Defendant failed to introduce any reliable
14  evidence at trial in support of his right to indemnification. This
15  Court finds Defendant's conduct described above falls within the
16  gross negligence and willful misconduct exceptions contained in the
17  indemnification provision.

18      If any of the above findings of fact are subsequently
19  determined to be conclusions of law, they shall be deemed to be so
20  designated.

### CONCLUSIONS OF LAW

23      The laws of the State of Delaware and common law on trusts
24  govern the law for the Trust Agreement and the disposition of this
25  proceeding. Under trust law, the burden of persuasion to justify
26  the upholding of a transaction by an interested trustee rests on the

---

28  [10]  Cash was paid to the bondholders who held 20% of the Debtor's
bonds.

18

fiduciary and not the beneficiary. Stegemeier v. Magness, 728 A.2d 557, 563 (1999). A trustee must satisfy his burden by a preponderance of the evidence. See e.g., In the Matter of the Estate of Jacob Shulman, 568 N.Y.S.2d 660, 165 A.D.2d 499 (1991). Here, the burden of persuasion rests on Street. He failed to satisfy his burden as discussed below.

This Court rejects Defendant's position that the "business judgment rule" applies to a trust. Once a trust relationship is established between a beneficiary and a trustee managing a corporation for a trust, the fiduciary standards of care apply to his conduct regarding the affairs of the corporation. Shulman, 568 N.Y.S.2d at 662, 165 A.D.2d at 502. In conducting a review of allegations of self-dealing, the standards of trust law and corporation law are different. Stegemeier, 728 A.2d at 562. Unlike corporate law, self-dealing on the part of a trustee is virtually prohibited under trust law. Id., at 563. The liability of a trustee of a controlling interest in a corporation can arise through imprudent corporate investment policy or a conflict of interest with respect to corporate decisions. 568 N.Y.S.2d at 662 (citations omitted). The principles of trust law impose a higher standard. Stegemeier, 728 A.2d at 564.

Accordingly, this Court holds Street to a higher standard of complete loyalty than that imposed on a director or officer of a corporation and rejects the lesser standard of the "business judgment rule". He failed to meet the higher standard when he (i) allowed the depletion of Trust assets by facilitating the transactions among FdM, the Trust, ATII, ATM and Dorsey for which the Trust, ATII and FdM were never reimbursed; (ii) purchased

companies with the ultimate intent of creating a public trailer conglomerate for which he could serve as the CEO and a major shareholder; (iii) permitted the payment of his personal expenses without justification; (iv) risked losing the Fruehauf license by not paying royalties; (v) hindered the sale of FdM; (vi) engaged in improper accounting of books and records; and (vii) created obstacles that made it difficult to replace him as trustee in an effort to keep his position.

## A. Counts I and II: Defendant breached his duty of loyalty and good faith.

Under trust law, self-dealing occurs when the fiduciary has a "personal interest in the subject transaction of such substantial nature that it might have affected his judgment in material connection." Stegemeier, 728 A.2d at 564. A person acting in a fiduciary capacity cannot also act for himself where he has duties to perform for another. Id. Thus, even without a personal stake, the duty of loyalty bars him from acting in the interest of third parties at the expense of the beneficiaries. Wilshire Credit Crop. v. Karlin, 988 F.Supp. 570, 574 n.4 (D. Md. 1997) (citations omitted). A trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary. Restatement (Second) of Trusts, § 170(1) (1959).

Here, Defendant breached his duty of loyalty when he permitted the Pension Plan to acquire Dorsey knowing the Trust would have to provide funds and management to Dorsey as part of a scheme involving the Trust, ATII and FdM to do business with Dorsey so as to establish a new trailer company where he would become the CEO. The transactions among those entities were not a fair equivalent

1   exchange, but instead, caused the Trust to lose money.   Dorsey was

2   not an asset of the Trust but was owned by the Pension Plan.

3   Defendant also served as Dorsey's President and CEO during his

4   tenure as trustee. Thus, any benefit to Dorsey inured to him and the

5   Pension Plan's beneficiaries and not to the Trust's beneficiaries.

6          Likewise, the proof of whether the TAC was fully informed and

7   approved of ATM's acquisition or was even legally capable to do so

8   was weak and cannot be relied upon as a basis to absolve Defendant

9   of liability.   Indeed, there remains a breach of duty of loyalty

10  when he permitted intercompany transfers between the ATM and FdM,

11  for which no equivalent exchange occurred, causing FdM to lose

12  $1,112,350.

13         Defendant also breached his duty of loyalty when he allowed

14  Trust assets to be diverted to pay for his personal expenses and to

15  pay his salary in excess of that authorized.   The evidence

16  justifying such reimbursements is wanting of proof.   This Court

17  finds incredulous Defendant's reliance on a report of benefits

18  produced by a local chamber of commerce attorney in Mexico to

19  support his entitlement to such reimbursements without producing

20  evidence that the TAC or the Bankruptcy Court approved these

21  excessive salaries or reimbursements.

22         Issue preclusion or collateral estoppel bars the relitigation

23  of an identical issue between the same parties or party in privity

24  that has been adjudicated previously by a competent court and has

25  reached finality in the first proceeding.   See Taylor v. Sturgell,

26  553 U.S. 880, 128 S. Ct. 2161 (2008).   As such, the decision of

27  Judge Walsh with respect to the limitations on the terms of

28  Defendant's employment and compensation has now become final as no

1  appeal was taken of his decision.    Based on the principles of
2  collateral estoppel, this Court adopts his opinion and will not
3  infer employment terms that are beyond what was set forth in the
4  Disclosure Statement, Plan and Trust Agreement.

5      The overwhelming evidence at trial showed that the Defendant
6  willfully engaged in self-dealing to advance his personal interest
7  ahead of that of the Trust's beneficiaries.    The Trust was not meant
8  to continue conducting business; it was meant to liquidate with
9  proceeds going to the beneficiaries.    The acts presented at trial
10 were all directed toward one goal--that of establishing a presence
11 and conducting a business in the United States contrary to the
12 Trust's express purpose.    Throughout this process of creating an
13 international company, Defendant enriched himself by allowing Trust
14 assets to be used for his excessive salaries and his personal
15 expenses.

16 **B.   Count III:   Defendant breached the Trust Agreement.**

17     The trustee can exercise only his powers as
        (a)  are conferred upon him in specific words by the terms of
18             the trust or
19         (b)  are necessary or appropriate to carry out the purpose of
            the trust and are not forbidden by the terms of the trust.
20

21 Restatement (Second) of Trusts § 186 (1959).    The language of the
22 trust instrument will be "given their ordinary meaning and the court
23 will not consider extrinsic evidence to vary or contract express
24 provision of a trust instrument that are clear, unambiguous and
25 susceptible of only one interpretation."    Wilmington Trust Co. v.
26 Annan, 531 A.2d 1209, 1211 (Del. 1987).

27     The  Trust  Agreement  expressly  prohibited  the  Trust  from
28 conducting any trade other than the preexisting business of the

1  Trust.    (Stipulated  Exhibit  15  ¶5.4.4.)    It  also  prohibited
2  purchasing assets or property other than that necessary to preserve,
3  conserve,  and  protect  trust  assets  in  carrying  out  the  Trust's
4  purpose to liquidate.  (Id.)  The main purpose of the Trust was to
5  "conserve[e] and liquidat[e] the Trust Estate for the benefit of the
6  Beneficial Interest holders. . . with no objective to engage in the
7  conduct of a trade or business (although companies whose stock is
8  owned by the Liquidating Trust may operate a business)."   (Id.
9  ¶2.3.)   The Trust also precluded any investment other than interest-
10 bearing deposits or certificates of deposit, among others.    (Id.
11 ¶5.4.5.)

12       Defendant breached the Trust Agreement when he affirmatively
13 recommended to the TAC ATM's acquisition, procured its approval, and
14 ultimately purchased ATM with Trust assets.   Under Delaware law, "an
15 interested transaction is not void but is voidable, and a court will
16 uphold such a transaction against a beneficiary challenge only if
17 the trustee can show that the transaction was fair and that the
18 beneficiaries  consented  to  the  transaction  after  receiving  full
19 disclosure of its terms."   Stegemeier, 728 A.2d at 563 (citations
20 omitted).   Defendant did not disclose the ATM acquisition to the
21 beneficiaries nor did the beneficiaries approve of it.

22       Even  under  a  more  relaxed  rule,  the  court  will  carefully
23 scrutinize all the attendant circumstances before it can find that
24 the sale is not detrimental to the trust.   Id., 728 A.2d at 563.
25 The purchase of ATM proved to be detrimental and unfair to the
26 Trust.    In  addition  to  the  sums  exceeding  the  purported  TAC-
27 authorized purchase price (which this Court already found suspect),
28 conducting  business  with  ATM  proved  to  be  unprofitable  for  FdM.

Because ATM had inadequate cash flow, FdM paid all of its expenses without reimbursement.   ATM eventually dissolved resulting in FdM losing $1,112,350.

Defendant also breached the fundamental purpose of the Trust when he permitted FdM to conduct business through Dorsey creating a loss to the Trust in the sum of $3,336,736.   Street failed to satisfy his burden of demonstrating that terms of the Trust allowed the transfers made to Dorsey.

As further evidence of breaching the main thrust of the Trust, Defendant's actions derailed the sale of FdM.   As discussed above, Defendant breached the Trust Agreement when he failed to salvage the souring deal with ACS, failed to file consolidated tax returns for the Trust entities, failed to maintain adequate books and records from which consolidated financial statements could be prepared and certified, unreasonably withheld the requisite environmental report and attempted for one last time to stop the liquidation of the company before Judge Walsh.   The foregoing facts present conclusive evidence of Defendant's blatant breach of the Trust Agreement.

### C.   Count V:   Defendant breached his duty to keep and render accounts.

A trustee owes a duty to keep and render clear and accurate accounts in administering trust assets.   Restatement (Second) of Trust, § 172 (1959).   Testimony at trial not only showed the lack of proper accounting with respect to the transactions among FdM, Dorsey, ATM, ATII and the Trust but the intent to keep certain information off of the Trust's books and records.   Most telling was Abel Wenning's testimony that Defendant instructed various members of his team that certain transactions should not be disclosed in

FdM's regularly maintained books and records or its financial statements. Defendant controlled, had a full grasp of the Trust's financial information, and caused FdM to maintain a second set of books under the name of a fictional entity. His preference not to convey information in writing, which his staff knew, contributed to the lack of proper documentation and improper record-keeping.

**D. Counts VI and VII: Defendant breached his duty to preserve Trust assets and pursue claims of the Trust.**

A trustee owes a duty to preserve trust property and to use due care to pursue claims of the trust. Restatement (Second) of Trust, §§ 176 and 177 (1959).

Defendant failed to preserve trust assets when he permitted the Trust's fiduciary liability and director and officer liability policies to go into "runoff" status causing difficulty for the successor trustee to obtain standard coverage at a higher premium. (Stipulated Exhibits 135-137.) Street willfully breached his duty to preserve trust assets when he destroyed the Trust's files contained in the Apple computer which the Trust owned.

Defendant also breached his duty to pursue Trust claims when he permitted certain adversary proceedings to become dormant making them more difficult to prosecute and settle. The delay certainly cost the Trust lost opportunity and money albeit difficult to quantify.

**E. Count VIII: Defendant breached his duty to keep trust assets separate.**

A trustee owes a duty to keep trust property separate from his individual property and ensure proper designation to the trust. Restatement (Second) of Trust, § 179 (1959). In this case,

Defendant breached this duty by permitting his companies, Chriss Street and Co. and Street Asset Management Co., to use the same facilities, personnel, and personal properties as the Trust's. Street failed to present evidence of any contractual agreement or allocations between his companies and the Trust that would establish compensation to the Trust for his companies' use of its office space, personnel and properties. Because of this commingling of assets, Defendant was enriched by having his companies not be responsible for their own expenses that were provided by using Trust assets.

The totality of the circumstances in this case and the overwhelming evidence lead this Court to conclude that Defendant breached the Trust Agreement and several of his duties to the Trust.

**F. Damages**

Under Delaware Code § 3581, a trustee's violation of a duty owed to a beneficiary is a breach of trust. Once established, a court may order any equitable remedy including:

> ". . .
> (3) compelling the trustee to redress a breach of trust by paying money, restoring property, or other means;
> (4) ordering a trustee to account;
> . . .
> (7) reducing or denying compensation to the trustee;
> . . .
> (9) granting any other appropriate relief."

Del. Code Ann. tit. 12 § 3581(b) (2010).

It is within the Court's discretion whether a trustee, found in breach of trust, shall receive full compensation, reduced compensation or deny him all compensation. Restatement (Second) of Trust § 243 (1959). Similarly, if a breach of trust occurs, the court may impose a surcharge for losses to the trust due to the

trustee's faulty management.    568 N.Y.S.2d at 662.    A beneficiary may charge a trustee . . . the amount required to restore the value of the trust property and trust distribution to what they would have been had the breach not occurred." Del. Code. Ann. tit. 12 § 3582(1).

Pursuant to Delaware Code § 3581, the Court finds that Plaintiff, as the Successor Trustee under Trust Agreement, is entitled to judgment against Street in the form of (i) money damages arising from the Defendant's breach of duty and breach of Trust Agreement, and (ii) reduction in compensation of the Defendant in excess of his authorized compensation including reimbursement for his personal expenses.

### G.  Indemnification

Delaware law prohibits exculpation or indemnification of a fiduciary for his willful misconduct.    Del. Code Ann. tit. 12 § 3303(a). Defendant failed to prove at trial and in his Post-trial Brief his entitlement to indemnification in this case.    In addition, Defendant failed to show evidence of the amount of reasonable attorney's fees might be entitled to be indemnified.

To the extent that he claims entitlement to indemnification because he exercised good business judgment, Defendant is subject to the fiduciary standards of loyalty and the business judgment rule does not apply.    Moreover, the defense that he did everything based on advice of counsel cannot stand against the weight of evidence showing he willfully engaged in various acts of self-dealing and breach of duty which are an exception to the indemnification provision of the Trust Agreement.    This Court, therefore, finds that the conduct described above amounts to gross negligence and willful

misconduct in violation of the Trust's limited authority granted to Street.

If any of the above conclusions of law are subsequently determined to be findings of fact, they shall be so designated.

## CONCLUSION

For the reasons stated herein, the Court finds in favor of the Plaintiff on Counts I-III, V-VIII that Defendant breached his fiduciary duties to the Trust and violated the Trust Agreement. Judgment will be entered against the Defendant in the amount stated therein consistent with this Memorandum of Decision.

DATED:     March 5, 2010

HONORABLE RICHARD M. NEITER
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **MEMORANDUM OF DECISION AFTER TRIAL** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **MARCH 5, 2010**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

US Trustee's Office (Los Angeles):  ustpregion16.la.ecf@usdoj.gov
Plaintiff's Counsel (Scott Blakeley):  SEB@BandBlaw.com; (Bradley Blakeley): bblakeley@BandBlaw.com

☐  Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Defendant's Counsel:**
Phillip B Greer
1280 Bison Suite B9 531
Newport Beach, CA 92660

**Plaintiff's Counsel:**
Robert Kugler and Robert DeMay
Leonard, Street and Deinard
150 South Fifth Street
Suite 2300
Minneapolis, MN 55402

☐  Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐  Service information continued on attached page